BALL, et al. *v.* CITY OF LOUISVILLE.

Division B

January 7, 1952

No. 38160 56 So. 2d 4

868

*Neal Prisock, Livingston & Fair,* Louisville; *J. D. Guyton,* Kosciusko; *R. H. & J. H. Thompson,* Jackson, for appellants.

870

871

872

*Strong & Smith,* Louisville, for appellee.

874

ROBERDS, P. J.

This is a contest over the effort to extend the municipal boundaries of the City of Louisville, Mississippi. The proceedings were had under Sections 3376 and 3379, Miss. Code of 1942, being prior to the passage of Chapter 491, General Laws of Mississippi 1950, superseding said sections of the Code of 1942. However, the matter was heard by the chancellor by agreement. He decided against the protestants and they appeal.

They relied in the lower court, and they rely here, upon two contentions, first, that the description of the territory proposed to be added is vague, indefinite and uncertain; and, second, that such addition would be unreasonable.

On the first question, the ordinance adopted by the mayor and aldermen described the added territory as "Beginning at a monument being the center of Main Street and Columbus Avenue of the City of Louisville, Mississippi running West in the center of West Main Street a distance of 5280 feet to beginning point of New Extensions of City limits, run thence North 4620 feet; thence East 9240 feet; thence South 10560 feet; thence West 9240 feet; thence North 5940 feet to beginning point * * *," less the present city limits, which limits themselves are described in detail. West Main Street runs in a generally westerly direction from said monument, but near its western terminus it veers to the north, so that from that veering point it is impossible to run due west and remain in the center of the street, or even in the street. In other words, running due west from the monument 5,280 feet would locate a point a short distance south of the point which would be reached by running that distance westerly in the center of Main Street. How-

ever, that does not make the description uncertain. ██ ██ In case of conflicting descriptions, courses and distances are controlled by, and must yield to, monuments, whether natural or artificial. 8 Am. Jur., Sections 53 and 62, pages 782 and 789; 11 C. J. S., Boundaries, Section 50, page 605; Potts v. Cannon Cotton Compress & Warehouse Co., 70 Miss. 462, 12 So. 147; Devlin on Real Estate, 3rd Edition, Vol. 2, Section 1029, page 1990; Holcomb v. McClure, 211 Miss. 849, 52 So. 2d 922, 923. It was held in Colton v. Seavey, 22 Cal. 496, that the monuments should control although they determined the course of the line to be northeasterly instead of westerly, which is exactly the situation we have here from the point where Main Street veers to the north.

The general rules of construction which obtain in the case of private conveyances have been applied in the construction of descriptions of municipal boundaries. This includes the rule that fixed monuments govern courses and distances. 62 C. J. S., Municipal Corporations, Section 38d, p. 118.

The question is somewhat confused by the fact that the City engaged R. T. Parker to make two surveys of the over-all territory, one before and one after the passage of the ordinance November 8, 1949, and in both surveys he got his starting point by running due west from the monument a distance of 5,280 feet, which point, as stated, was a short distance south of the point in the center of Main Street. However, the City never adopted either of Parker's surveys. The ordinance was adopted subsequent to the first survey. It did not follow that survey and the city officials testified they worked out their own description and deliberately settled upon the center of the street as being the course to be followed in locating the starting point. As to Parker's second survey, it is not disputed that he was given a copy of the ordinance by which to make the survey. He testified he misplaced, or lost, the copy, and presuming he should start at the

same point at which he started the first time he did that. However, that survey was never adopted by the City. Of course, the municipality could only act through its minutes and the description contained in the ordinance is the only description it ever adopted upon its minutes, and was the description of which the inhabitants were given due notice by publication. It might be added that Section 3376, Code 1942, under which this proceeding was had, does not require that a survey or plat be made by the municipality. All that is required is that an ordinance be passed defining with certainty the territory which it is proposed to include and also defining the entire boundary as changed. Section 3377, Code 1942, requires publication of the ordinance. All of these things were done. We are of the opinion the chancellor correctly decided this contention against appellants.

On the reasonableness of the extension, the following facts are either admitted or undisputed: It is stated in the brief of appellee, and not denied by appellants, that the municipality of Louisville was incorporated in 1882. (The records in the office of the Secretary of State show the year to be 1836.) The original incorporated territory aggregated 1,000 acres. The limits have never been extended. The last census showed the population to be 4,360. It has increased one-third in the last ten years. In that period 334 new residences and 38 new business houses have been erected, and at the time of the trial 56 new residences, 4 business houses and one church were being constructed within the old corporate limits. The territory proposed to be added consists of 1,240 acres, in which there are 266 residences and 916 inhabitants. According to the county assessment, the value of the property in the new territory in the year 1949 was $821,285. There are four large corporations located entirely, or partly, within the extended area. The assessed value of their property, on said county assessment basis, is as follows: Gulf, Mobile & Ohio Railroad about $74,500;

American Creosote Works $88,000; Southern Natural Gas Company $450,000; Fair Lumber Company $46,000.

The testimony on behalf of protestants tended to establish the following facts: Fair purchases part of its electricity from the City. Fair has its own lighting plant, and in times of interruption of City service has furnished to the City some electric current. It has its own water works, and at the time of the trial was installing additional wells, increasing its water capacity to one hundred thousand gallons. It has its own water lines and hydrants. One City fire truck is stationed at the plant. Witnesses said the only benefit to Fair from the extension would be mosquito and insect extermination by use of the City fogging machine.

The Creosote Company gets electric current from REA and water from the City. It has a private arrangement with the City firemen to furnish it fire protection when needed.

The Railroad Company runs through the present corporate limits. It gets water from the City. It had a 100,000 gallon storage tank which it turned over to the City without charge. It purchases electric current from the City. Witnesses concluded the only benefit to accrue to the Railroad by the new addition would be the benefit of the fogging machine.

The Gas Company has three water wells with tank storage capacity of 300,000 gallons; has its own pumps and hydrants. It gets no water from the City. It purchases about one-third of its electric current from the City but is preparing to install another electric generator, which will provide it with all the electric power it needs. Witnesses said it needed no police protection, nor garbage disposal, by the City.

As to the individuals, witnesses said the land included in the proposed addition consisted mainly of pasture and farm lands, much of which not being suitable to development into city lots; some do, and some do not, get water

and electric current from the municipality. They do not want to be brought into the corporate limits, nor do they want sewerage, city police protection, garbage disposal, fire protection, street lights or pest extermination.

Mr. W. D. Ball was perhaps the principal witness for objectors. He owns 25 acres of land which will be included within the added territory. He inspected and examined the situation in the old and new areas with the purpose of gathering information bearing upon the merits of this controversy. He testified that there were 890 vacant lots in the present corporate limits; that new subdivisions, if established and developed, could provide 892 additional lots, making available a total of 1,782 additional lots within the old limits. In the present limits 688 residences have sewerage; 633 have not; that of the 916 people to be brought into the municipality by the extension 20 already have sewerage; that only about 40% of the new territory east of Highway 15 is suitable for residential lots; that 60% of this is low and wet; that the new territory lying on the east of the present corporate limits consists mainly of timber, farm and pasture lands; that only about half of that is suitable for development into residential lots; that the new territory proposed to be included on the south is mainly timberland and not built up except along Highway 15; that not over 25% of that area would be suitable for development into lots for residences; the remainder is lowland and overflows; on the west of the present limits, from Main Street south, the land is largely subject to overflow. In his judgment not over 10% of this territory is suitable for residential purposes. On the west, north of Main Street, there is much lowland. The City formerly dumped its garbage there. In his judgment, only about 25% would be suitable for residential purposes.

Mr. Walter Bennett was an important witness for objectors. He said the new territory on the west of the City was crossed by a branch and, in his opinion, was not

suitable for residential purposes; that only 50% of the new area southwest of the City was suitable for building purposes; that much of it overflows. He also said that 50% of the new territory on the south was subject to overflow; that it was pasture and farm lands; that the new area east of Highway 15 and south of the City was not suitable for high-class residential purposes; that most of the entire new area consisted of fields and woods; and that the only police protection needed in that territory was to suppress the whiskey traffic therein and the sheriff had endeavored to stop that.

Mr. Webb, who made a preliminary layout, said that of the 266 residences within the new territory, only 92 could be served with sewerage; that to do that would greatly increase expenditures and decrease revenue of the municipality. He estimated the cost of the improvements necessary to serve the new territory to be $375,655.

Objectors, by witnesses, asserted the present bonded obligation of the City to be $286,500; the assessed value of the property within the City limits to be $3,663,955, and that in the new territory to·be around one million dollars; that to make necessary improvements in the added area would require a large bond issue, which would approach within $37,437 of the maximum bonds the City could legally issue.

As to the evidence on behalf of the City, it invokes the admitted and undisputed facts above set out. It then offered evidence to show that the city water and sewerage systems have been greatly extended at large expense to the taxpayers within the City; that a separate school district, with boundaries co-extensive with the present city limits, has been created, and bonds of the present City have been sold and the proceeds used to erect and equip suitable school buildings of the present value of half a million dollars; that the City owns its fire-fighting equipment, including one chemical truck; that it has an efficient police force; employs a full-time health officer;

removes all garbage; operates what is called a fogging machine for extermination of mosquitoes and other insects; owns its water and electric systems; has adequate sewerage system; that children residing outside of the city limits and within the territory proposed to be added attend the City schools just as those within present city limits; that these should pay their pro rata share of the expense of operating the schools; that it is prepared to furnish sewerage service to all who desire it; that 95% of the white residents of the City have such sewerage; that residents who have not connected with sewerage are required to construct septic tanks; and that, if the extension is made, a cafeteria will be constructed and operated to furnish meals for school children.

As to the territory proposed to be added, it is in evidence that a number of places therein are 'a menace to health, which would be corrected if it is brought into the City; that the City will undertake to eradicate therefrom mosquitoes and other insects; that the sheriff of the county has not been able to enforce the law in this area and the City will furnish ample police protection, day and night; garbage removal, etc.; that residents of added area will greatly benefit from such addition by better sanitary and health conditions, police protection and fire-prevention; that the City has made provision for supplying all of these benefits to the new area; that as to the four corporations, three of them are using 36% of the water produced by the City; they pay only 9% of the revenue brought in by operation of the water system; that all four get a certain amount of electricity from the City; that a number of places near them are unsanitary and a danger to health; that the present graveled streets leading to them will be hard-surfaced; that the sheriff has not been able to enforce the law in the vicinity of these plants; and that the City will be prepared to do that.

The City proposes, and will be prepared, to erect a 200,000 gallon elevated water tank; will sufficiently increase in number and size the water mains so as to fully supply water to the residents; and furnish full fire protection at reduced rates. A plat is in evidence showing the proposed enlargement of the water and sewerage system; that the plans in this respect have been submitted to, and approved by, the State Rating Bureau; that there are only 36 houses in the new territory to which water would not be immediately available; that the added facilities to, and improvements in, the new territory would approximate $211,090; that the outstanding bonded debt of the present City is $270,700; that the City, with the added territory, could legally issue $469,000 additional bonds and be within the 15% limit prescribed by the law; and that the City now has on hand $30,000. In other words, that the City is willing, ready and prepared to furnish all proper facilities and accommodations to the new residents, and is financially able to do so and has made provisions therefor.

Of course, no two cases are exactly alike, but this Court has commented upon the pertinency and weight of some of the factors entering into the question now being considered.

Forbes v. City of Meridian, 86 Miss. 243, 38 So. 676, held: (a) that the extension should be considered as an entirety; (b) that the revenue to the City from the new territory should be considered but is not determinative; (c) that the fact that some parts of the new territory are low and marshy, and that other parts are vacant, does not render the ordinance unreasonable; (d) that the fact that many people who live in the proposed annexed territory have not consented to such annexation is not of great material consequence; (e) that protection of health is important; (f) and that the fact that property owners in the new area must pay additional tax is not a controlling reason against annexation where the property will

derive benefits in lower insurance rates and better fire protection.

In Walker v. Town of Waynesboro, 202 Miss. 830, 32 So. 2d 455, 456, the old corporate limits were enlarged from 640 acres to 1,920 acres, and a large part of the land in the new territory was open, pasture and farm land, and some overflowed. The Court, in affirming the annexation, said "The entire record sufficiently reveals a purpose toward and a probability of benefit both to the citizens of the old and of the new areas * * *."

In Nicholson v. Town of Booneville, 208 Miss. 800, 45 So. 2d 594, the City planned to furnish the new area improved streets, sidewalks, fire and police protection, water and sewerage facilities and garbage disposal as soon as practical. Also, it was shown there were 165 acres of unimproved land within the existing corporate limits, suitable chiefly for farming, and there were a substantial number of homes to which water and sewerage facilities were not being furnished. There were 225 residences in the new area. The cost of furnishing the new facilities was estimated to be $143,217, which appeared to be greater than the amount for which the City could then legally issue bonds. All of the foregoing factors were properly considered as applied to the reasonableness of the extension. As to the bond limit, the Court said the jury had the right to take into account the practical necessity of extending the new improvements gradually and that the existing bond liability would be reduced. That question is not involved here. However, all of the other factors in the Nicholson case are presented in the case at bar. That case was affirmed by the lower court and this Court.

In Kennedy v. City of Kosciusko, 203 Miss. 4, 33 So. 2d 285, there was evidence that over 400 residences were located in the new area; that most of the new territory was being supplied with water and lighting facilities by the City; that approximately half of the pupils in the

city schools lived outside of the present city limits, and that about 80% of the proposed area was suitable for residential purposes. This was contradicted but the Court held these were questions of fact for the jury and pertinent to the issues involved. This Court did not feel justified in setting aside the verdict.

■■■ Now, in the case at bar, the board of mayor and aldermen, by passage of the ordinance proposing to add the new territory, adjudicated that the extension is reasonable. The burden was upon the objectors to overturn this and show such extension to be unreasonable. Forbes v. City of Meridian and Kennedy v. Kosciusko, supra. The chancellor held that they had not done that. To reverse the case on the merits, we would have to override both the action of the municipal authorities and the finding of fact and judgment of the chancellor. We would not hesitate to do that if justified in so doing, but, looking at the entire scope of the object of this extension and the factors involved therein, having in mind the fact that the chancellor found the facts favorable to the extension where evidential conflicts exist, we see no clear ground or reason justifying us in overriding the judgment of the mayor and aldermen and the findings of the chancellor.

Affirmed.